UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

**ZAZZALI, FAGELLA, NOWAK,**
**KLEINBAUM & FRIEDMAN**
One Riverfront Plaza
Newark, New Jersey 07102
Tele:   (973) 623-1822
Fax:    (973) 623-2209
Robert A. Fagella, Esq. (7855)
Attorneys for Plaintiffs

---

|  |  |
|---|---|
| **VICTOR PALUMBO, MICHAEL** : | |
| **PURDUE, FRANK MASINO, FELICIA** : | |
| **ELTZHOLTZ, ROMAN BLAHUT,** : | |
| **JEFFREY MONTANARO, LORI** : | |
| **SALVATORE, THOMAS MULLIGAN,** : | |
| **DESHON WHITE** : | |

Case No. 06CV5331(DMC)

**Plaintiffs,**   :

vs.   :

**Civil Action**

**UNITED PARCEL SERVICE OF**   :
**AMERICA, INC. UPS HEALTH AND**   :   **COMPLAINT AND JURY DEMAND**
**WELFARE PLAN, UPS HEALTH**   :
**AND WELFARE PACKAGE and**   :
**JOHN AND JANE DOES, 1-10,**   :

**Defendants.**   :

---

Plaintiffs, Victor Palumbo, Michael Purdue, Frank Masino, Felicia Eltzholtz, Roman Blahut,

Jeffrey Montanaro, Lori Salvatore, Thomas Mulligan, and Deshon White, as participants in and/or

beneficiaries, respectively, of defendants UPS Health and Welfare Plan and the UPS Health and

Welfare Package, hereby allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs are participants in the defendant United Parcel Service of America ("UPS")
health plans, which were created to provide medical, hospital and prescription benefits for thousands
of UPS employees, retirees and their families. In this action, plaintiffs contend defendants have
breached their fiduciary obligations imposed by ERISA and the governing trust documents by failing
to insure that monies which UPS promised to fund these benefits are collected, paid, received and
expended solely and exclusively for plan participants. By failing to do so, the defendants have
depleted the assets of the health and welfare plans by hundred of millions of dollars while
simultaneously converting those assets to its own uses.

2.      This matter arises under the provisions of the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. §1001, et seq.

3.      ERISA is federal legislation which regulates employee welfare benefit plans. More
specifically, ERISA Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes upon fiduciaries of an
ERISA regulated employee welfare benefit plan a duty to act "solely in the interest" of the plan
participants and beneficiaries, and to protect plan assets for the "exclusive purpose" of providing
benefits to participants and defraying the costs of running the plan. In pursuit of those ends, Section
404(a)(1)(B) of ERISA requires that a plan fiduciary act "with the care, skill, prudence, and
diligence under the circumstances then prevailing that a prudent man acting in like capacity and
familiar with such matters would use in the conduct of an enterprise of a like character and with like
aims."

4.      UPS as the "named fiduciary" of the UPS Health and Welfare Plan and UPS Health

and Welfare Package, (collectively "the Plans") breached the fiduciary duties it owed to the plaintiffs, and other similarly situated participants and beneficiaries of the Plans, by failing and/or refusing to make or collect contractually mandated contributions to the Plans and by utilizing and appropriating trust assets of the Plans for its own corporate interests and purposes.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to Section 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1), and under the Court's jurisdiction over federal questions pursuant to 28 U.S.C. §1331.

6.      All plaintiffs are residents of the State of New Jersey. Plaintiff Victor Palumbo resides in Dover, New Jersey. Plaintiff Michael Purdue resides in Whippany, New Jersey. Plaintiff Frank Masino resides in North Arlington, New Jersey. Plaintiff Felicia Eltzholtz resides in Nutley, New Jersey. Plaintiff Roman Blahut resides in Pompton Plains, New Jersey. Plaintiffs Jeffrey Montanaro and Lori Salvatore reside in South Plainfield, New Jersey. Plaintiff Thomas Mulligan resides in Hawthorne, New Jersey, and Plaintiff Deshon White resides in Newark, New Jersey. Defendant UPS maintains corporate offices in Secaucus, New Jersey. As such, venue of this action is properly laid in this district by virtue of 28 U.S.C. §1391(b) and 29 U.S.C. §1132(e)(2) & (f).

## PARTIES

7.      All plaintiffs are participants in and/or beneficiaries, respectively, of the Plans. Plaintiffs Palumbo, Purdue, Masino and Montanaro are, respectively, either active, full time employees of defendant UPS, or on leave from employment with the Company. Plaintiffs Blahut and White are active, part time employees of UPS. Plaintiff Mulligan is a retiree who was previously

CORRECTED UPS WELFARE(new).doc                 3

employed by UPS. Plaintiffs Eltzholtz and Salvatore are dependent spouses of employee participants. All plaintiffs receive their health and welfare benefits, providing hospital and prescription coverage, through participation in the various Plans. Plaintiffs Palumbo, Eltzholtz, Masino and Blahut are participants in, and receive health and welfare benefits from, the UPS Health and Welfare Plan. Plaintiffs Purdue, Salvatore, White, Mulligan and Montanaro are participants in, and receive their health and welfare benefits from, the UPS Health and Welfare Package.

8.      Defendant UPS and the Plans maintain  corporate offices at 55 Glendale Parkway NE, Atlanta, Georgia. UPS maintains New Jersey offices in Secaucus, New Jersey.  UPS operates a nationwide package distribution system in every state of the union. UPS employs hundreds of thousands of employees across the country, including thousands in New Jersey.

9.      UPS is the sponsor, plan administrator and named fiduciary of the UPS Health and Welfare Plan and the UPS Health and Welfare Package. The UPS Health and Welfare Plan ("Welfare Plan") and the UPS Health and Welfare Package ("Welfare Package") (collectively "the Plans") are employee welfare benefit plans as defined by ERISA, created and sponsored by UPS to provide medical benefits to participants and beneficiaries of the of the Plans.

10.     In tandem, these Plans provide medical, hospital and prescription benefits for over 60,000 UPS active and retired employees and their dependants in New Jersey and across the country, including all plaintiffs.

11.     Defendants, John and Jane Does 1-10, are fictitious names of the designated trustees, fiduciaries and/or plan administrators of the Welfare Plan and the Welfare Package whose identities are presently unknown.

## STATEMENT OF FACTS

### A.   CREATION OF THE PLANS

12.    On or about December 28, 1992, defendant UPS established the "United Parcel Service Health and Welfare Trust" (the "Trust") to serve as the funding vehicle for the company's contractually undertaken obligations to provide medical and hospital benefits to its employees, the employees of its subsidiaries and affiliates, and their covered dependents, and in accordance with the requirements of ERISA, and section 501(c)(9) of the Internal Revenue Code of 1986, as amended.

13.    Between December 28, 1992 and December 31, 1999, the Trust was periodically amended to effect several changes, including two name changes to the "United Parcel Service Health and Welfare, Healthcare Package, and Health Program Trust" and the "United Parcel Service Health and Welfare Plan Trust For Collectively Bargained Employees," successively; to add additional participating health and welfare plans, including, effective April 1, 1998, the Welfare Package (all plans covered by the Trust to be hereinafter referenced collectively as the "Plans"), and to appoint individual successor Trustees to replace the original individual Trustees.

14.    By amendment dated April 27, 2000, the Trust was restated to "combine the Trust and the Corporate Trust Agreement," eliminate the role of the individual Trustees, name UPS as "Named Fiduciary" of the Plans, and appoint Boston Safe Deposit and Trust Company ("BSD&T" or the "Bank") as Trustee. The restated Trust recites that:

> This Trust is established for the exclusive benefit of the participants and their beneficiaries. This Agreement shall be interpreted in a manner consistent with that intent and with the intention of the Company that the Trust hereunder satisfy those provisions of the [Internal Revenue] Code relating to voluntary employee beneficiary associations. The assets of the Trust allocable to any Plan shall be

held for the exclusive purposes of (i) providing benefits to employees participating in the Plan and their beneficiaries, and (ii) defraying the reasonable expenses of administering the Plan and the Trust

15.     The restated Trust is complemented by a Trust Agreement, dated April 27, 2000, between UPS "in its corporate capacity and as the Named Fiduciary" and BSD&T. The Trust Agreement limits the duties and responsibilities of the Bank as Trustee to those expressly contained therein, and states that the Bank "shall have no duty to determine or collect contributions under the Plan, shall have no responsibility for any property until it is received and accepted by the Trustee, and shall not be responsible for the adequacy of the Fund to meet and discharge any liabilities under any Plan."

16.     Under the restated Trust, UPS designates itself as the "Named Fiduciary," accepting all fiduciary obligations which ERISA imposes upon fiduciaries. Thus, the restated Trust provides that UPS has "the sole duty and responsibility for the determination of the accuracy or sufficiency of the contributions to be made under each Plan, the transmittal of same to the Trustee [the Bank], and compliance with any statute, regulation, or role applicable to contributions."

### B.    FUNDING OF THE PLANS

17.     For many years UPS has been party to a collective bargaining agreement known as The National Master United Parcel Service Agreement (the "National Agreement") with the International Brotherhood of Teamsters, which provides terms and conditions of employment for Teamster-represented UPS employees across the nation. The National Agreement also recognizes and incorporates Collective Bargaining Supplemental Agreements (the "Supplemental Agreements") with various affiliated Teamster locals, including Teamsters Local Union 177, which is the local

representative for UPS employees in New Jersey. The terms and conditions of employment of unionized employees of UPS, including wages and benefits, are set by the Agreements.

18.     Over the years, through the National Agreement and Supplemental Agreements, UPS agreed to provide health and welfare benefits to its employees including, but not limited to, those in New Jersey for the life of the collective bargaining agreements, the most recent of which run through 2008.

19.     UPS also agreed to make specific monetary contributions to the Plans, as well as other Teamster Taft-Hartley Funds in which it participates, in specifically negotiated and agreed upon amounts to fund health benefits solely for the Plan participants. The National Agreements define the overall increases in contribution which UPS agreed to make for the applicable period to the health plans and the pension plans it operated. The National and Supplemental Agreements would, at times, also make specific allocations of the overall monetary contribution between the welfare plans and the pension plans covering the affected employees through local negotiating committees.

20.     Thus, the National Agreement for the period May 1, 1982 through June 1, 1985 provided as follows:

> 4. Health and Welfare and Pension.
>
> A. Combined weekly Health and Welfare and Pension contributions shall be increased (for each employee) as follows:
>
> > Effective May 1, 1982: $10.00 per week.
>
> The weekly Health and Welfare and Pension contributions shall be allocated by their respective Joint Supplemental Area Negotiating Committees, subject to the approval of the Joint National Negotiating Committee.

21.     The Supplemental Agreement between UPS and Local 177 for May 1, 1982 through

May 31, 1985, did not provide for any additional contributions to the Retirement Plan, and, therefore,

the entire increase of $10.00 a week (or $0.25 per hour for part-time employees) was to be

contributed to the company Health and Welfare Plan. This amount was in addition to the amount

UPS was already contributing, per employee, as of May 1, 1982. On information and belief, similar

provisions for an allocation were made in Supplemental Agreements of the local Teamster unions

throughout the country whose members were participants in the Plan.

22.     The National Agreement for the period August 1, 1987 through July 31, 1990,

provided that overall Health and Welfare and Pension contributions by UPS would be increased by

an additional $8.00 per employee per week (or $0.20 per hour) on August 1, 1987, August 1, 1988

and August 1, 1989, respectively.   The National Agreement further provided that:

> . . . The Applicable Supplement Rider or Addendum will reflect the
> appropriate agreed to increases to the Pension Plans in those
> Supplements, Riders or Addenda where all the employees are in the
> company Health and Welfare Plan and/or covered by Section F of this
> Article.

23.     The Local 177 Supplemental Agreement for UPS New Jersey employees for the

corresponding period provided that the additional $0.20 per hour as of August 1, 1987 and August 1,

1988 would be contributed to the Retirement Plan.  Effective August 1, 1989 the allocation provided

that $0.15 per hour would be contributed to the Retirement Plan, and $0.05 per hour to the company

Health Plan. On information and belief, similar provisions for an allocation were made in

Supplemental Agreements of other local Teamster unions throughout the country whose members

were participants in the Plans.

CORRECTED UPS WELFARE(new).doc                    8

24.     The National Agreement for the period August 1, 1990 through July 31, 1993,

provided for increases to Health and Welfare and Pension of $14.00 per week (or $0.35 per hour) on

August 1, 1990, August 1, 1991 and August 1, 1992, respectively.   The National Agreement

specified that of that increase, $0.20 per hour was to be allocated in additional contributions to the

Health and Welfare Plan in each of the three years of the National Agreement, as follows:

> The applicable Supplement, Rider or Addendum will reflect the
> appropriate agreed-to increases to the Teamster Pension Plans in
> those Supplements, Riders or Addenda where all the employees are in
> the Company Health and Welfare Plan and/or covered by Section (f)
> of this Article. These increases shall be allocated as follows: twenty
> cents ($0.20) per hour to Health and Welfare and fifteen cents ($0.15)
> per hour to Pension in each of the three years payable as outlined
> above.

25.     Since the National Agreement specified the allocation, no allocations were made

in any Supplemental Agreement for that period.

26.     The National Agreement for the period August 1, 1993 through July 31, 1997,

provided for increases in Health and Welfare and/or Pension contributions of an additional

$16.00 per week (or $0.40 per hour) on August 1, 1993; This increased to $18.00 per week (or

$0.45 per hour) on August 1, 1994 and August 1, 1995, respectively, and to $20.00 per week (or

$0.50) per hour effective August 1, 1996. The National Agreement further specified that $0.25

per hour of each of the increases for the period August 1, 1993 through July 31, 1997

respectively was to be allocated to the Health and Welfare funds. The remainder of the increases

in each year were to be allocated to the Pension Funds. The National Agreement states:

> The applicable Supplement, Rider or Addendum will reflect the
> appropriate agreed-to increases to the Teamster Pension Plans in
> those Supplements, Riders or Addenda where all the employees are in

CORRECTED UPS WELFARE(new).doc                    9

the Company Health and Welfare Plan and/or covered by Section (f) of this Article. These increases shall be allocated as follows: twenty-five cents ($0.25) per hour to Health and Welfare and the remainder to pension in each of the four years payable as outlined above.

27.     Since the National Agreement specified the allocation, no allocations were made in any Supplemental Agreement for that period.

28.     The National Agreement for the period August 1, 1997 through July 31, 2002, provided that Health and Welfare and Pension contributions were to be increased by an additional $12.00 per week (or $0.30 per hour), effective August 1, 1997, August 1, 1998, August 1, 1999, respectively, and $16.00 or ($0.40 per hour), effective August 1, 2000 and August 1, 2001. The National Agreement for that period further specified that of those increases, $0.05 per hour would be allocated to Health and Welfare in the first year of the contract; an additional $0.15 per hour in the second, third and fourth years of the contract, respectively, and an additional $0.20 per hour in the fifth year of the contract. The remainder of the monetary increases in each year were allocated to the Pension fund. The allocation is set forth in Article 34 (a) of the National Agreement as follows:

The applicable Supplement, Rider or Addendum will reflect the appropriate agreed-to increases to the Teamster Pension Plans in those Supplements, Riders or Addenda where all the employees are in the Company Health and Welfare Plan and/or covered by Section (f) of this Article. These increases shall be allocated as follows: five cents ($0.05) per hour to Health and Welfare in the first year of the contract, fifteen cents ($0.15) per hour to Health & Welfare in the second, third and fourth years of the contract, and twenty cents ($0.20) per hour to Health & Welfare in the fifth year of the contract. The remainder of the contribution increase each year will be paid into pension.

CORRECTED UPS WELFARE(new).doc                     10

29.    Since the National Agreement specified the allocation, no allocations were made in any Supplemental Agreement for that period.

30.    The current National Agreement for the period August 1, 2002 through July 31, 2008, provides for an increase to Health and Welfare and/or Pension contributions of an additional $26.00 per week (or $0.65 per hour) effective August 1, 2002, and $24.00 per week (or $0.60 per hour) effective August 1, 2003, August 1, 2004, August 1, 2005, August 1, 2006, respectively increasing to $28.00 per week (or $0.70 per hour) effective August 1, 2007. The National Agreement further specifies that $0.25 per hour of the increased contributions for each year of the Agreement would be allocated to Health and Welfare in local agreements, where all employees were enrolled in the UPS Health and Welfare Plan.

31.    Accordingly, for the period August 1, 2001 through July 31, 2008, UPS agreed to contribute to each Plan an additional $0.25 per hour, per participating employee, over the base amount it was contributing as of July 31, 2002.

32.    Thus, by August 1, 2001, the total amount of promised and mandated increases in contributions required to be made by UPS to the Plans was $3.10 per hour, per employee. For the period August 1, 2002 to August 1, 2004, additional negotiated increases brought the total increases in contributions to $3.85 per hour per employee.

33.    During the 2002-2006 period, by virtue of these promises, the total annual contribution increases alone which UPS promised to make to the Plans for its thousands of participating employees exceeded hundreds of millions of dollars. Those monies, in turn, were earmarked and dedicated to fund the current Health and Welfare benefits of the employees, and

were and are to be held for the sole and exclusive benefit of the participants.

## C.   THE FIDUCIARY BREACH

34.   Commencing in 2002 and continuing to the present, UPS as Employer and Plan Sponsor has failed to make, collect and maintain all mandated contributions to the Plans. UPS, as the named fiduciary of the combined Plans, has instead raided the Plans' assets to fund benefits, appropriated to its corporate self in excess of $350 million of the Plans' assets in lieu of making the promised contributions on behalf of participants in the Plans, and in turn decreased the Plans' assets available for the use of all participants, including plaintiffs, by that amount.

35.   The losses are illustrated by the history of funding of the Plans, and reduction in the balances in each Plan, in the last several years, as demonstrated by Exhibits A and B attached hereto and incorporated therein.

36.   In 2001, UPS contributions to the Health and Welfare Plan based upon the number of participants were $182,829,159, and Plan expenses were $173,338,749. In 2002, with approximately the same number of participants and mandated increased contribution rate, contributions decreased to $46,437,681. In order to pay the approximately $190 million needed to provide health and welfare coverage in 2002 for participants and their families, existing Plan assets were instead utilized, and the Plan's assets were depleted by year's end from $233,996,072 to $95,391,274 – a reduction of approximately $140 million.

37.   In 2004, and notwithstanding an increase in the hourly contribution rate, UPS contributed only $6,168,335 on behalf of a slightly decreased number of participating employees in the Health and Welfare Plan. Plan expenses for the year were $103,917,642. As a result, UPS again

CORRECTED UPS WELFARE(new).doc                12

raided the existing assets in the Plan to fund the benefits, and the Plans' assets decreased from $96,940,030 to $675,871 – a reduction of approximately $96 million.

38.    Similarly, Health and Welfare Package contributions in 2001 were $193,518,749 and Plan expenses were $183,473,457. In 2002, with approximately the same number of participants, contributions decreased to $53,968,862. To pay for benefits totaling $221.5 million, UPS raided existing Plan assets to fund the benefits, and the Plan's balance was accordingly reduced from $67,578,511 to a deficit of (-$93,504,969) - a decrease of approximately $160 million.

39.    As a result, as shown in Exhibits A and B, the total and combined assets of the Plans since year end 2001 were decreased and depleted by over 99%, i.e., total assets for both Plans have been reduced from $300 million in 2001 to $2.2 million by the end of 2004.

40.    By depleting the Plans' assets through failure to contribute, collect, and/or maintain monies owed to the Plans and by using existing fund assets in lieu of mandated contributions to pay for health and welfare benefits, defendants have reduced, by hundreds of million of dollars, funds that were to be utilized solely "...for the exclusive benefit of the participants and their beneficiaries."

41.    The resulting reduction of assets has caused, and will continue to cause, serious harm to all participants. By failing to make and collect promised contributions, and instead funding benefits by raiding accumulated Plan assets, UPS has reduced Plan monies which were to be used solely for participants, and which otherwise would be available and utilized to fund both existing and future Plan benefits.

## COUNT ONE
### (Breach of Fiduciary Duties)

42.     Plaintiffs repeat and incorporate the foregoing allegations of this Complaint as if set

forth in full herein.

43.     ERISA Section 404 (a) (1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary: Shall

discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries

and –

> (A) for the exclusive purpose of
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
> (B) with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct of
> an enterprise of a like character and with like aims....

44.     As fiduciaries with respect to the Plan, UPS, and John and Jane Does 1-10, had the

authority and obligation to act to ensure payment of health and welfare contributions owed by UPS to

the Plans.

45.     As fiduciaries, UPS, and John and Jane Does 1-10, also had a fiduciary duty to both

investigate the feasibility of collecting and enforcing collection of delinquent health and welfare

contributions UPS was contractually obligated to make to the Plans.

46.     By failing to investigate, collect and compel the payment of the hundreds of millions

of dollars of delinquent contributions owed to the Plans, UPS, and John and Jane Does 1-10, as

ERISA fiduciaries, failed to discharge their statutorily imposed duties to act solely in the interests of

Plan participants and their beneficiaries, and for the exclusive purpose of providing benefits to

CORRECTED UPS WELFARE(new).doc                14

participants and beneficiaries, and defraying the reasonable expenses of administering the Plan. Said defendants also failed to act or omitted acting with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matter would use in the conduct of an enterprise of a like character and with like aims, by failing to take any action to investigate the delinquency and collect the delinquent health and welfare contributions contractually owed to the Plan by UPS.

47.    As a result of defendants' fiduciary breach, the Plans and the participants and beneficiaries of the Plans have been damaged by the reduction of available assets for current and future benefits.

## COUNT TWO
### (Prohibited Transaction)

48.    ERISA § 406 (a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits a fiduciary with respect to a plan from directly or indirectly causing a plan to extend credit to a "party in interest", as defined in ERISA § 3(14), 29 U.S.C. § 1002(4), if he knows or should know that such transaction constitutes an extension of credit.

49.    ERISA 406 (a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits a fiduciary with respect to a plan from directly or indirectly causing a plan to use assets for the benefit of a party in interest, if he knows or should know that such transaction constitutes a use of plan assets for the benefit of a party in interest.

50.    ERISA 406 (b)(1), 29 U.S.C. § 1106(b)(1), prohibits the use of plan assets by a

fiduciary with respect to a plan for his own interest or for his own account.

51.    As a fiduciary with respect to the Plan, and the employer of employees covered by the Plan, UPS is a party in interest with respect to the Plan pursuant to ERISA § 3(14)(A) and (C); 29 U.S.C. § 1002(14)(A) and (C).

52.    By failing to comply with and enforce the contribution obligations created by the National Agreements and Supplemental Agreements and owed to the Plan, UPS has extended credit from the Plan to itself in violation of ERISA § 406(a)(1)(B) when it knew or should have known that its failure to comply with or enforce the contribution requirement constituted an extension of credit to itself.

53.    By failing to comply with or enforce the contribution requirements created by the National Agreements and the Supplemental Agreements and due and owing to the Plan, UPS as fiduciary of the Plans and a party in interest as defined by ERISA has used Plan assets for its own benefit, when it knew or should have known that its failure to make payment to or to collect the delinquent contributions it owed to the Plan, constituted a prohibited use of a Plan assets in violation of ERISA § 406(a)(1)(D).

54.    By failing to enforce the contribution requirements created by the  National Agreements and Supplemental Agreements, UPS has used plan assets for its own interest and/or for its own account, in violation of ERISA § 406(b)(1).

55.    By its failure to honor or enforce the contribution requirements created by the National Agreements and Supplemental Agreements, UPS has unlawfully profited from Plan assests by converting to itself the use of hundreds of millions of dollars owed to the Plans for the general

CORRECTED UPS WELFARE(new).doc          16

purposes of UPS, converting Plan assets for its own corporate uses, and failing to hold, use, and maintain Plan assets for the sole and exclusive benefit of the participants and beneficiaries of the Plans.

## COUNT THREE
### (Aiding and Abetting a Breach of Fiduciary Duties)

56.     Plaintiffs repeat and incorporate the foregoing allegations of this Complaint as if set forth in full herein.

57.     Under ERISA § 405, a fiduciary with respect to a plan is liable for the breach of duty by another fiduciary if the fiduciary knowingly participates in a fiduciary breach, enables another fiduciary to commit a breach, or has knowledge of the other fiduciary's breach and does not take reasonable efforts to remedy the breach.

58.     Upon information and belief, defendants John and Jane Does 1-10 had knowledge of UPS' delinquency in making the contractually mandated contributions to the Plan, of the decision by UPS, as ERISA fiduciary, not to take any action to compel or collect delinquent contributions owed to the Plan, and of the unlawful action of UPS in converting to its own corporate uses the funds held in trust for participant benefits.

59.     Upon information and belief, none of defendants John and Jane Does 1-10 took any steps to remedy the fiduciary breach caused by the failure of UPS, as named fiduciary of the Plans, to take any action to collect the delinquent health and welfare contributions contractually owed to the Plan by UPS as employer.

60.     As a result of the individual and collective failure of defendants John and Jane Does 1-10 to act, each of them has, individually and collectively, breached the fiduciary duty owed to the participants and beneficiaries of the Plan, who have suffered damages.

**WHEREFORE** the plaintiffs hereby demand judgment against defendants UPS, the Plans and John and Jane Does 1-10, jointly and severally, for the following on each of the foregoing counts of the complaint:

(a)  A declaration that defendants have violated applicable provisions of ERISA, and the requirements of the underlying trust, by failing to collect, maintain and expend assets of the Plans solely and exclusively for Plan participants;

(b)  An Order requiring UPS, and John and Jane Does 1-10, to pay to the Plan all losses to the Plan resulting from their breaches of fiduciary duty, including, but not limited to, all contributions owed, but not paid, to the Plan as alleged above, as provided by ERISA, 29 U.S.C. § 1109(a);

(c)  Injunctive and other appropriate equitable relief to remedy the breaches of fiduciary duty alleged above as provided pursuant to 29 U.S.C. § § 1109(a) and 1132(a)(2) & (3);

(d)  An accounting of all Plan assets and a determination of the specific amounts owed to each Plan by UPS;

(e)  An Order appointing an Independent Fiduciary or Fiduciaries authorized to hold the Plans' assets in Trust, manage and administer the Plans and the Plans' assets, and enforce the terms of ERISA and UPS' contribution obligation against UPS;

(f) Reasonable attorneys fees and costs as provided by, 29 U.S.C. § 1132(a), and

(g) Interest, damages and such other relief as this Court deems equitable and just.

ZAZZALI, FAGELLA, NOWAK
KLEINBAUM & FRIEDMAN
Attorneys for the plaintiffs

Dated:  November 2, 2006          By:  _____
                                        Robert A. Fagella

## JURY DEMAND

Pursuant to *Fed. R. Civ. Pro.* 38, plaintiff hereby demands a trial by Jury on all issues

so triable.

ZAZZALI, FAGELLA, NOWAK
KLEINBAUM & FRIEDMAN
Attorneys for Plaintiffs

Dated:  November 2, 2006          By: _____

Robert A. Fagella, Esq.

## CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to Rule 4:5-1, the undersigned certifies that to the best of his knowledge, the within matter in controversy is not the subject of any other action pending in any other Court or of a pending arbitration proceeding nor is any action or arbitration proceeding contemplated nor are other parties required to be joined in this action.

ZAZZALI, FAGELLA, NOWAK
KLEINBAUM & FRIEDMAN
Attorneys for Plaintiffs

Dated: November 2, 2006                 By: _____
                                             Robert A. Fagella, Esq.

## UPS HEALTH & WELFARE PLAN
### (Established In 12/30/92)

| FYE | Plan Expenses<br><br>$ | Number of Participants Beginning of year and end of year | UPS Contribution<br><br>$ | Assets at year end<br><br>$ |
|---|---|---|---|---|
| 12/31/04 | 103, 917,642 | 14,395-14,044 | 6,168,335 | 675,871 |
| 12/31/03 | 144,574,157 | 19,391-14,395 | 143,350,265 | 96,940,030 |
| 12/31/02 | 190,661,532 | 19,270-19,391 | 46,437,681 | 95,391,274 |
| 12/31/01 | 173,338,749 | 19,481-19,270 | 182,829,159 | 233,996,072 |
| 12/31/00 | 161,070,061 | 17,802-19,481 | 159,504,879 | 220,434,543 |
| 12/31/99 | 135,026,297 | | 141,890,386 | 216,950,411 |
| 12/31/98 | 168,752,637 | | 185,108,958 | 205,198,574 |
| 12/31/97 | 170,910,955 | | 175,245,629 | 177,512,141 |
| 12/31/96 | | | | 168,109,260 |

EXHIBIT A

20073.doc

**UPS HEALTH & WELFARE PACKAGE**
**(Established April 1, 1998)**

| FYE | Plan Expenses $ | Number of Participants beginning of year and end of year | UPS Contribution $ | Assets at year end $ |
|---|---|---|---|---|
| 12/31/04 | 394,584,196 | 52,710 - 53,075 | 485,695,793 | 1,557,017 |
| 12/31/03 | 302,536,568 | 33,841 - 52,710 | 299,975,447 | (91,50,981) |
| 12/31/02 | 221,582,683 | 33,111 - 33,841 | **53,968,862** | **(93,504,969)** |
| 12/31/01 | 183,473,457 | 32,064 - 33,111 | 193,518,749 | 67,578,511 |
| 12/31/00 | 163,141,838 | 28,949 - 32,064 | 161,556,523 | 53,224,072 |
| 12/31/99 | 128,885,516 | | 135.437.443 | 49,695,126 |

**EXHIBIT B**

20079.doc