NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| VICTOR PALUMBO, et al., | **Hon. Dennis M. Cavanaugh** |
| Plaintiffs, | **OPINION** |
| v. | Civil Action No. 06-CV-5331 (DMC) |
| UNITED PARCEL SERVICE OF AMERICA, INC., et al., |  |
| Defendants. |  |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Defendants United Parcel Service of America, Inc. ("UPS"), UPS Health and Welfare Plan ("UPS Plan") and UPS Health and Welfare Package ("UPS Package," and collectively, "Defendants") to dismiss or stay or, in the alternative, to transfer and award to Defendants their attorneys' fees, costs and such other relief as the Court deems appropriate. Pursuant to Rule 78 of the Federal Rules of Civil Procedure, no oral argument was heard. After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that Defendants' motion to stay is **granted**.

**I.   BACKGROUND**

The President and Secretary Treasurer of Teamster Local 177 ("Local 177") and seven other persons who are members of or associated with Local 177 ("Plaintiffs") commenced this action seeking to enforce UPS's alleged obligation to contribute to the two UPS-sponsored and administered health and welfare plans in which Local 177 members participate, namely the UPS Plan and UPS Package. Plaintiffs do not allege that they were denied benefits as participants in these

plans, but rather that UPS is obliged to contribute specified amounts to the plans. UPS and the union entered into a collective bargaining agreement (the "CBA"), which provides for the exclusive means of resolving disputes between UPS and Local 177. This procedure applies to disputes concerning the proper interpretation of the CBA. The parties must exhaust the grievance and arbitration procedures before persuing another remedy. Section 301 of the Labor Management Relations Act ("LMRA") takes precedence, as a matter of law with respect to the resolution of the contractual issues on which those claims depend. UPS filed a grievance addressing the contractual issues that give rise to this lawsuit in order to interpret the CBA.

### A. ERISA

The Employee Retirement Income Security Act of 1974 ("ERISA") is a federal statute that establishes standards for pension plans in private industry and provides extensive rules regarding the federal income tax effects of transactions associated with employee benefit plans. ERISA was enacted to protect the interests of employee benefit plan participants and their beneficiaries by: requiring disclosure of financial and other information concerning the plan; establishing standards for plan fiduciaries; and providing remedies and access to the federal courts.

### B. THE LOCAL 177 MEMBERS' AGREEMENT

Approximately 235,000 UPS employees in the United States are represented by the International Brotherhood of Teamsters ("IBT") for collective bargaining purposes. Most IBT-represented employees at UPS are also members of an IBT Local, each of which has a geographical jurisdiction. The CBA sets forth the terms and conditions of employment for IBT-represented UPS employees. Plaintiffs suggest that UPS is a party to the CBA, but Defendants dispute this. The CBA is comprised of two parts: (1) the National Master United Parcel Service Agreement (the "National

Master Agreement"), which applies to all of UPS's IBT-represented employees; and (2) the Local Supplement, which applies to employees in particular geographic areas and/or Local Unions. The CBA applicable to Local 177 members is comprised of the National Master Agreement and either (1) the IBT Local 177 Drivers Collective Bargaining Supplemental Agreement (the "Drivers Supplement"), which covers drivers and various inside employees or the IBT Local 177 Mechanics; or the (2) Maintenance Collective Bargaining Supplemental Agreement (the "Mechanics Supplement," and collectively the "Local 177 Supplements"), which covers automotive and maintenance mechanics.

### C. THE LOCAL 177 MEMBERS' BENEFITS

Unlike most full-time IBT-represented employees at UPS who receive health and welfare benefits under jointly-trusted plans, full-time employees who are also Local 177 members are provided health and welfare benefits from two plans that are funded, administered and controlled solely by UPS (the "UPS Plan" and the "UPS Package," or collectively, the "Plans"). The Plans provide benefits to a broad group of UPS employees nationwide, including Local 177 members. UPS, as the Plan's sponsor and administrator, conducts various administrative functions, including contract negotiation with various services and insurers and decision-making for open enrollment.

The Plans' benefits are funded through a Voluntary Employees Beneficiary Association ("VEBA"). A VEBA is a trust fund that holds, on a tax-favored basis, amounts paid by an employer to meet the cost of the benefits it offers. Local 177 members' entitlement to benefits from the Plans is set forth in Article 55 of the Drivers Supplement and Article 5 of the Mechanics Supplement. Article 55 of the Drivers Supplement provides, in pertinent part:

> The Company agrees to provide and administer Health and Welfare benefits as
> set forth below for each seniority employee . . . on the active payroll . . . .

3

> Coverage for all eligible full time and part time employees as well as the nature and the amount of said benefits will be as outlined in the summary plan descriptions for "UNITED PARCEL SERVICE HEALTH AND WELFARE PACKAGE, UNITED PARCEL SERVICE HEALTH AND WELFARE PLAN, or the UNITED PARCEL SERVICE HEALTH PROGRAM" as appropriate. The Company shall not be limited to any particular method of providing such benefits. The Health Plan stays as is unless a charge is mandated by the Government or is agreed to by the parties.
>
> For description of benefits refer to plan booklet.

(Langan Aff., Ex. A(1) at 29-30.)

Consistent with these provisions, the Plans' summary plan descriptions set-forth in detail the coverage provided to Local 177 members which, in addition to medical coverage, also includes welfare benefits, such as dental, vision, short-term and long-term disability and life insurance. With the exception of medical benefits provided on a self-pay basis during the statutorily-mandated Consolidated Omnibus Budget Reconciliation Act ("COBRA") continuation period, the benefits provided under the Plans are non-contributory. The benefits are financed exclusively by UPS on either a self-insured basis or, with long-term disability and life insurance, by premiums to third-party insurers.

### D. THE COMPLAINT

On November 8, 2006, Plaintiffs commenced this action, contending that Defendants acted unlawfully by failing to make and collect contributions to the Plans at specified rates for the period from 2002 to the present. Plaintiffs base their claim on Article 34 of the National Master Agreement, which deals primarily with UPS's obligation to make contributions to the jointly-trusted pension and health and welfare plans in which it participates. Article 34 provides,

in pertinent part:

> Health & welfare and/or pension contributions shall be increased by twenty-six dollars ($26.00) per week on August 1, 2002, and twenty-four dollars ($24.00) per week on August 1, 2003, and twenty-four dollars ($24.00) per week on August 1, 2004, and twenty-four dollars ($24.00) per week on August 1, 2005, and twenty-four dollars ($24.00) per week on August 1, 2006, and twenty-eight dollars ($28.00) per week on August 1, 2007. Where the employees are covered by both Teamster Health & Welfare and Pension Funds in Supplement, Rider or Addendum, the weekly health & welfare and pension contributions shall be allocated by the respective Joint Supplemental Area Negotiating Committees, subject to the approval of the Joint National Negotiating Committee. In those Supplements, Riders or Addenda where some of the employees are covered by a Teamster Health and Welfare Plan and some of the employees are covered by the Company Health and Welfare Plan, the amount of money allocated to the Company Health and Welfare Plan shall be the same as the amount allocated to the Teamster Health and Welfare Plan in the Supplement, Rider or Addendum. The applicable Supplement, Rider or Addendum will reflect the appropriate agreed-to increases to the Teamster Pension Plans in those Supplements, Riders or Addenda where all the employees are in the Company Health and Welfare Plan and/or covered by Section (f) of this Article. These increases shall be allocated as follows: twenty-five cents ($.25) per hour to Health and Welfare in each year of the contract. The remainder of the contribution increase each year will be paid into pension.

(Langan Aff., Ex. A(2) at 67-68.)

Plaintiffs argue that the final three sentences of this provision require UPS to contribute specified amounts to "Company Plans," such as the Plans in this lawsuit, which UPS alone administers. Plaintiffs contend that UPS breached this contractual obligation and acted unlawfully by failing to "make, collect and maintain all mandated contributions to the Plans" and by allegedly "depleting the Plans' assets through failure to communicate, collect, and/or maintain monies owed to the Plans" at the rates allegedly established by the National Master Agreement. (Compl. ¶¶ 34, 40, 41.) In Counts One and Three of the Complaint, Plaintiffs contend that the

Plans' fiduciaries breached their duties under ERISA by failing to collect and compel the payment of contractually required contributions. In Count Two, Plaintiffs contend that, "by failing to comply with or enforce the contribution requirements" created by the National Master Agreement, UPS, as a fiduciary and an employer/plan sponsor, violated ERISA rules by extending credit from the Plans and using Plan assets for itself.

### E. GRIEVANCE CONCERNING ARTICLE 34 OF THE NATIONAL MASTER AGREEMENT

On February 14, 2007, in response to Plaintiffs' Complaint, UPS initiated the National Master Agreement's grievance procedures to interpret Article 34. The CBA requires that all "grievances and/or questions of interpretation arising under the provisions of the National Master Agreement shall be resolved in" accordance with Article 8 of the CBA. (Langan Aff. ¶ 18; Ex. A(2) at 18.) The grievance, which is scheduled to be heard by the National Grievance Committee, requests a determination of whether, as Plaintiffs contend in this lawsuit, Article 34 should be construed to impose on UPS an obligation to make "contributions" at a specified rate. (Langan Aff. ¶¶ 18, 20; Ex. E.)

The grievance was scheduled to be heard before the National Grievance Committee the week of April 16, 2007. The National Grievance Committee, however, adjourned the hearing scheduled for the week of April 16, 2007.

## II. DISCUSSION

Plaintiffs' claims must be stayed as a matter of law for failure to exhaust the contractual grievance procedures. Plaintiffs' arguments, although framed as ERISA claims, cannot be resolved under ERISA, but rather must be determined under Section 301 of the LMRA. This

provision mandates resort in the first instance to the CBA's contractual grievance and arbitration procedures. Because Plaintiffs failed to exhaust these procedures, their claims must be stayed or administratively termed pending the outcome of the grievance procedures.

An employee may not resort to the courts to redress grievances under a collective bargaining agreement until the exclusive remedies under the grievance and arbitration provisions of the contract have been exhausted. In Republic Steel Corp. v. Maddox, the Supreme Court held:

> [I]ndividual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress . . . . [U]nless the contract provides otherwise, there can be no doubt that the employee must afford the union an opportunity to act on his behalf.

379 U.S. 650, 652-53 (1965). Similarly, Third Circuit precedent supports dismissing suits in which an employee did not first exhaust the grievance procedures set forth in the labor agreement, noting that "[i]n issues involving CBA interpretation, courts are not permitted to 'weight the[] merits of [a] grievance,' because '[w]hether the moving party is right or wrong is a question of contract interpretation for the arbitartor.'" Keck v. PPL Elec. Utils. Corp., 99 F.App'x 357, 360 (3d Cir. 2004) (quoting United Steelworkers of Am. v. Am. Mfg. Co., 363 U.S. 564, 568 (1960); see also Wheeler v. Graco Trucking Corp., 985 F.2d 108, 112 (3d Cir. 1993). Courts have recognized "the primacy of arbitral resolution of industrial disputes as [the] centerpiece" of the LMRA. See Voilas v. GMC, 170 F.3d 367, 372 (3d Cir. 1999) (citing Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 455-56 (1957)); see also Eberle Tanning Co. v. Section 63L, FLM Joint Bd., Allegheny Div., United Food and Comm. Workers

7

Int'l Union, 682 F.2d 430, 434 (3d Cir. 1982). Submission of the claim through the National Master Agreement's grievance and arbitration procedures would have the concomitant effect of satisfying ERISA's exhaustion requirements. See, e.g., D'Amico v. CBS Corp., 297 F.3d 287, 291 (3d Cir. 2002) (affirming summary judgment for employer on plaintiff's ERISA breach of fiduciary duty claims for failure to exhaust); see also Perrino v. Southern Bell Tel. & Tel. Co., 209 F.3d 1309 (11th Cir. 2000).

These principles have been applied not only to enforce a collective bargaining agreement under LMRA § 301, but also to claims asserted under other federal statutes, including ERISA, where such claims rested on a threshold interpretation of an underlying collective bargaining agreement. For example, in Viggiano v. Shenango China Div. of Anchor Hocking Corp., the Third Circuit stayed a claim under ERISA for breach of fiduciary duty brought by plan participants challenging an employer's refusal to contribute to a welfare fund for hospital benefits during a strike, finding that the claim should have first been pursed in the grievance procedures provided for by the CBA. See 750 F.2d 276 (3d Cir. 1984).

In Viggiano, the employer sought to dismiss the claim on grounds that plaintiffs failed to submit the dispute to arbitration. The District Court rejected this argument, concluding that the contractual arbitration provision did not extend to controversies over denied insurance benefits, for which individual employees could pursue claims with the carrier and in federal court. The Third Circuit reversed, however, and remanded with instructions to the District Court to stay the ERISA action pending the result of the grievance procedure. See Viggiano, 750 F.2d at 281. Recognizing the "firmly established labor policy" requiring that issues of contract interpretation

8

be arbitrated the Court determined that "[t]he correctness of the employer's reading is reserved for arbitration, not for judicial decision. Although the right to insurance benefits under the Plan is an essential part of this case, the immediate question is the source of the obligation to fund those entitlements. Unless the collective bargaining agreement establishes a duty to maintain the program, ERISA does not come into play." Id. at 280.

The Court concluded that its decision to require arbitration was not inconsistent with the Supreme Court's decision in Schneider Moving & Storage Co. v. Robbins, which attempted multi-employer fund *trustees* seeking recovery of delinquent contributions from the contractual exhaustion requirement. See 466 U.S. 364 (1984). Whereas trustees are not parties to collective bargaining agreements and, thus, do "not have available to them the economic weapons of strikes and lockouts[,]" the Viggiano court observed that labor organizations, such as the union supporting Plaintiffs in this case, are parties to contracts and have full use of economic measures. Thus, in suits brought by or at the behest of unions or their members, the presumption of arbitration continues, "even thought the controversy affects an employee benefit plan." 750 F.2d at 281.

The Third Circuit also applied the Viggiano court's reasoning in Sebowski v. Pittsburgh Press Co., where plaintiffs commenced a putative class action lawsuit against their employer, their union and the trustees of an incentive compensation plan in which they participated, alleging both (1) an LMRA claim that the employer failed to make contributions to the plan in violation of the collective bargaining agreement and (2) an ERISA breach of fiduciary duty claim against the plan's trustees for failure to collect the contributions in question. See 188 F.3d 163

9

(3d Cir. 1999). Initially, the District Court stayed the breach of fiduciary duty claim against the plan's trustees pending arbitration. Once an arbitrator ruled that the employer did not violate the agreement by failing to make contributions, the court dismissed the ERISA claims. As the court observed, to sustain a claim for breach of fiduciary duty for failure to collect contributions, plaintiffs were required to demonstrate that contributions were owed under the collective bargaining agreement and that the plan fiduciaries' failure to enforce that obligation was willful or in bad faith. See Sebrowski, 188 F.3d at 170 (citing Burke v. Latrobe Steel Co., 775 F.2d 88 (3d Cir. 1985)). Thus, in the absence of a predicate finding that there existed a contractual obligation to contribute in the first place, there was no basis for the claim to proceed. See Viggiano, 750 F.2d at 281.

In the current case, the circumstances are similar to Viggiano and Sebrowski. Although the Complaint does not expressly reference the LMRA, Plaintiffs' claims – whether for breach of fiduciary duty or violation of ERISA's prohibited transaction provisions – turn on a threshold contractual determination, namely whether UPS owes contributions at a specified rate under the CBA. The LMRA requires that this threshold determination be resolved pursuant to the grievance and arbitartion proedures contained in the CBA. ERISA is only relevant after the issue regarding UPS's contractual obligation has been resolved. As such, this is precisely the type of dispute that is best committed to the arbitral process. See United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 581-82 (1960).

The National Master Agreement contains broad grievance procedures permitting either the union or the employer to seek a resolution of this issue. UPS already initiated the grievance

10

process in light of the claims asserted in this litigation. Consistent with Viggiano and Sebrowski, the parties must complete the grievance proceedings before this Court may properly entertain Plaintiffs' ERISA claims. Adjudication of Plaintiff's ERISA claims requires a predicate interpretation of the CBA, so the ERISA claims are stayed and this Court retains jurisdiction to address – post-arbitration – Plaintiffs' ERISA claims. See Kilkenny v. Guy C. Long, Inc., 288 F.3d 116, 121 (3d Cir. 2002); Viggiano, 750 F.2d at 279; see also Sebrowski, 188 F.3d at 170. Furthermore, to insure that the Court's review is not unusually delayed, the arbitration shall proceed immediately. Accordingly, in the exercise of its discretion, this Court stays this action pending the outcome of the grievance and arbitration proceedings, at which point its judgment of the ERISA claims will be guided by the outcome of such proceedings. Defendants' motion to stay this lawsuit in the interim is **granted** and the Clerk of the Court is directed to administratively term this action pending the decision of the National Grievance Committee.

### III. CONCLUSION

For the reasons stated, it is the finding of this Court that Defendants's motion to stay is **granted**. An appropriate Order accompanies this Opinion.

                                          S/ Dennis M. Cavanaugh
                                          Dennis M. Cavanaugh, U.S.D.J.

Date:     October 2, 2007
Orig.:    Clerk
cc:       Counsel of Record
          The Honorable Mark Falk, U.S.M.J.
          File